UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TRACY PEASANT
o/b/o D.R., JR., *A Minor*,

                Plaintiff,            CIVIL ACTION NO. 12-13288

        v.                  DISTRICT JUDGE SEAN F. COX

                        MAGISTRATE JUDGE MARK A. RANDON

COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.
_____/

## REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 10, 13)

Plaintiff Tracy Peasant ("Plaintiff") filed suit on behalf of her minor son, D.R., Jr. ("D.R."), challenging the Commissioner of Social Security's ("the Commissioner") final denial of his benefits application. Cross motions for summary judgment are pending (Dkt. Nos. 10, 13). District Judge Sean F. Cox referred the motions to this Magistrate Judge for a Report and Recommendation (Dkt. No. 3).

## I.    RECOMMENDATION

Because the Administrative Law Judge ("ALJ") made no findings with respect to Listing 112.11 for the unadjudicated time period, this Magistrate Judge **RECOMMENDS** that Plaintiff's motion for summary judgment be **GRANTED**, Defendant's motion for summary judgment be **DENIED**, and the case be **REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g).

## II.     DISCUSSION

### A.  *Framework for Disability Determinations*

Under the Social Security Act (the "Act"), Disability Insurance Benefits and Supplemental Security Income are available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

Although the standard of review of the Commissioner's decision is the same, children's disability claims are reviewed under criteria different from adults. There is no five step evaluation. Instead, pursuant to the 1996 enactment of the Personal Responsibility and Work Opportunity Reconciliation Act, which changed the definition of disability for children seeking Social Security benefits, *see* 42 U.S.C. § 1382c(a)(3)(c), a three step process is used to determine whether a child is "disabled." First, the child must not be engaged in substantial gainful activity; second, the child must have a severe impairment; and third, the severe impairment must meet, medically equal or functionally equal one of the impairments found in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. § 416.924. In order to be found disabled based upon a listed impairment, the claimant must exhibit all the elements of the listing. *See* 20 C.F.R. § 416.924(a); *Hale v. Sec 'y of Health & Human Servs.,* 816 F.2d 1078, 1083 (6th Cir.1987). It is insufficient that a claimant comes close to meeting the requirements of a listed impairment. *See Dorton v. Heckler,* 789 F.2d 363, 367 (6th Cir.1986).

Under section 416.926(a), if a child's impairment or combination of impairments does not meet or is not medically equivalent in severity to a listed impairment, then the Commissioner will assess all functional limitations caused by the impairment to determine if the child's impairments are *functionally equivalent in severity to any of the listed impairments* of Appendix 1. (20 C.F.R. § 404, subpt. P, app. 1) (emphasis added). The following areas of development (referred to as "domains") are considered in determining whether a child's impairments are functionally equivalent to a listed impairment: (1) Acquiring and Using Information; (2) Attending and Completing Tasks; (3) Interacting and Relating with Others; (4) Moving About and Manipulating Objects; (5) Caring for Yourself; and (6) Health and Physical Well Being. *See* 20 C.F.R. § 416.926a. A finding of functional equivalence to a listed impairment is warranted when the child has an extreme limitation in one domain of functioning or marked limitations in two domains of functioning. *See* 20 C.F.R § 416.926a(d).

**B.  Standard of Review**

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited such that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses") (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such

-3-

relevant evidence as a reasonable mind might accept as adequate to support a conclusion."
*Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks
omitted); *see also Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations
omitted) (explaining that if the Commissioner's decision is supported by substantial evidence, "it
must be affirmed even if the reviewing court would decide the matter differently and even if
substantial evidence also supports the opposite conclusion"); *Mullen v. Bowen*, 800 F.2d 535,
545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a
zone of choice within which the decisionmakers can go either way, without interference by the
courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, this Court
is limited to an examination of the record and must consider that record as a whole. *See Bass v.
McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007); *Wyatt v. Sec'y of HHS*, 974 F.2d 680, 683 (6th
Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been
cited by the Appeals Council." *Heston*, 245 F.3d at 535. There is no requirement, however, that
either the ALJ or this Court discuss every piece of evidence in the administrative record. *See
Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider
all the evidence without directly addressing in his written decision every piece of evidence
submitted by a party") (internal quotation marks omitted). Further, this Court does "not try the
case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at
509; *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to
evaluate the credibility of witnesses, including that of the claimant").

## III.    REPORT

### A.  Administrative Proceedings

Plaintiff – on behalf of her minor son, D.R. – applied for supplemental security income in January of 2006; the Commissioner denied the application (Tr. 69). Plaintiff and D.R. appeared before ALJ Mary S. Connolly without counsel on August 28, 2008 (Tr. 69). In a written decision, ALJ Connolly found D.R. was not disabled (Tr. 69-79). Plaintiff did not appeal (Tr. 69-79).

Plaintiff filed a second application for supplemental security income on September 15, 2009, alleging D.R. became disabled on January 1, 2006 (Tr. 14). After the Commissioner initially D.R.'s application, Plaintiff and D.R. appeared with counsel for a hearing before ALJ John Dodson, who considered the case *de novo* (Tr. 14). In a written decision, the ALJ found D.R. was not disabled (Tr. 15). Plaintiff requested an Appeals Council review (Tr. 7-10). On June 6, 2012, the ALJ's decision became the final decision of the Commissioner when the Appeals Council declined further review (Tr. 1-4).

### B.  ALJ Findings[1]

D.R. was 10 years old and considered a school-age child on the date his 2009 application was filed (Tr. 17). The ALJ applied the three-step sequential evaluation process to determine whether D.R. was disabled, and found at step one that D.R. had not engaged in substantial gainful activity since September 15, 2009, the date of D.R.'s application filing date (Tr. 17).[2]

---

[1] Unless otherwise stated, "ALJ" refers to ALJ Dodson.

[2] The ALJ limited his decision to the issue of disability from September 27, 2008 – the day after ALJ Connolly's previous decision – through the date of his decision (Tr.14).

-5-

At step two, the ALJ found that D.R. had the following "severe" impairment: attention deficit hyperactivity disorder ("ADHD") (Tr. 18).

At step three, the ALJ found that D.R. did not have an impairment or combination of impairments that met or medically equaled one of the listings in the regulations (Tr. 18).

The ALJ next determined the degree of limitation in each of six functional domains, and found that D.R. did not have an impairment or combination of impairments that functionally equaled any of the listings. The ALJ found that D.R. had: (1) less than marked limitations in Acquiring and Using Information, Attending and Completing Tasks, Interacting and Relating with Others, and Health and Physical Well-Being; and (2) no limitation in Moving About and Manipulating Objects, and Caring for Yourself (Tr. 19-29).  Accordingly, the ALJ found that D.R. was not disabled (Tr. 29).

### C.  Administrative Record

#### 1.      D.R.'s Hearing Testimony and Statements

At the time of the hearing, D.R. was 12 years old and in fifth grade (Tr. 43). D.R. repeated first and fourth grade, and attends a resource room (Tr. 43-44).[3] D.R. testified that he has trouble with math and reading; daydreams during the school day; and sometimes does not hear all of his teachers' lessons (Tr. 51). D.R. has problems with his homework: he sometimes gets distracted or daydreams, and he missed seven assignments while in fifth grade (Tr. 49-50)

---

[3] Resource rooms are classrooms – with fewer students – "where a special education program can be delivered to . . .  [a] student who qualifies for special classes or regular class placement, but needs special instruction in an individualized or small group setting for a portion of the day" as defined by the student's IEP (Individualized Education Plan). Sue Watson, *What is the Special Education Resource Room?* About.com, *available at* http://specialed.about.com/od/idea/a/resourceroom.htm (last accessed June 25, 2013).

At school, D.R.'s behavioral problems include arguing and fighting with other kids; failing to return to his classroom after leaving for the restroom; and food fights (Tr. 46-47). Consequently, he has had to sit with teachers at lunch (Tr. 47). He has also been suspended for approximately three days, and recently received a note from his teachers instructing him to go home (Tr. 47).

At home, D.R. argues with his siblings; occasionally, the fights become physical (Tr. 46, 52). D.R. gave his sister a black eye (Tr. 46). He also talks back to his mother; leaves the house without telling his mother; and, hurt his two year old nephew while wrestling with him (Tr. 52-53). D.R. testified to other issues: he has nightmares and wets the bed; he has seen things out of the corner of his eye that were not there; he has heard people playing in the backyard who were not there; and has seen his dead grandmother and Jesus (Tr. 48).

D.R. takes Adderall (Tr. 55). He is generally happy, and could think of nothing that made him sad (Tr. 66).

### 2.      Plaintiff's Hearing Testimony and Statements

Plaintiff testified that when D.R. was younger, he would react to being told "no" by banging his head against the brick house until it bled (Tr. 60). Plaintiff reports that D.R. no longer bangs his head to this extent; although, he does punch his fists into his room's wall, despite any pain it causes (Tr. 60).

Plaintiff testified about when D.R. gave his twin sister a black eye (Tr. 57). D.R. aggravated his sister, and refused to leave her room; the fight escalated when the two began pushing one another (Tr. 57). D.R. claimed "he didn't do it," a response that he gives his mother frequently, even when she catches him in the act of misbehaving (Tr. 57).

-7-

D.R. steals money from the household, then falsely tells Plaintiff that people at school gave him the money (Tr. 57-58). D.R. spends the money at the gas station on his way to school (Tr. 58). Plaintiff does not know whether D.R. "realize[s] what lies [ ] he tells" (Tr. 57). Sometimes, D.R. does not come directly home from school; other times, D.R. will come home, eat, and then leave without telling Plaintiff (Tr. 59). D.R. does not seem to understand this concerns Plaintiff (Tr. 59).

Plaintiff discussed the time that D.R. hurt his two year old nephew with his head: "[D.R.] knocked the wind out of him. . . [D.R.] doesn't look at [his nephew] as being two years old[; h]e thinks that he can just wrestle with him like an older child" (Tr. 60-61).

D.R. frequently wets the bed and has nightmares (Tr. 62). Plaintiff testified that D.R. has temper problems – he "turns into the Incredible Hulk" when told "no" (Tr. 64). He cannot focus on homework; and, even when he watches television, D.R. is unable to sit still (Tr. 64).

Plaintiff testified that D.R. has been suspended from school "quite a few times," generally for fighting; truancy (where D.R. goes to the bathroom and does not return to the classroom); class disruption; and talking back to teachers  (Tr. 62-63). Plaintiff also described a time when D.R. was not allowed to join his classmates for lunch because of his behavior; he had to sit with teachers (Tr. 63).

Plaintiff has noticed no side effects from D.R.'s Adderall (Tr. 63). Adderall is the only medication that D.R. currently takes, and Plaintiff reported that "it's helping some" (Tr. 65). D.R. is in special education classes and sees a counselor every school day (Tr. 63, 65-66).

### 3.      Treatment History and School Records[4]

On November 20, 2008, D.R. saw Santosh Rastogi, M.D. for a psychiatric evaluation (Tr. 184). Dr. Rastogi noted that D.R.'s previous doctor, Dr. Hosseini, had been treating him since 2006 with Concerta for ADHD and Tofranil for bed-wetting; and, he showed a high degree of hyperactivity, inattentiveness, impulsiveness, and aggressiveness (Tr. 184; see Tr. 213). It was reported that D.R. has a lot of trouble at home: he is very impulsive, aggressive, inattentive, disruptive, destructible, fidgety, and restless; has trouble paying attention and completing assignments; is very oppositional and defiant; has problems with his temper; and experiences difficulty getting along with others (Tr. 184, 186). Plaintiff reported that none of D.R.'s earlier medications – Adderall XR and Concerta – had been effective (Tr. 184). Dr. Rastogi found that: D.R.'s psychomotor activity was increased, speech and hearing were normal, immediate and recent remote memory were intact, and concentration was poor; he was not very cooperative, showed no fragmentation of thought process, and had trouble with some simple calculations; his general fund of knowledge was limited; and, his formal insight and judgment were fair (Tr. 190). Dr. Rastogi assigned a GAF of 51,[5] and diagnosed D.R. with ADHD, hyperactive or combined

---

[4] The record also includes evidence from the previously adjudicated time period: a consultative examination report, dated April 19, 2006, from Nick Boneff, PhD (Tr. 144-49), social worker David McNally's October 17, 2007 Child Services Comprehensive Assessment from Development Centers, Inc. (Tr. 193-201), and a portion of an October 31, 2007 psychiatric evaluation from Dr. Hosseini, a psychiatrist with Development Centers, Inc. (Tr. 243).

[5] The GAF score is:

a subjective determination that represents the clinician's judgment of the individual's overall level of functioning. It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). A GAF score of 31-40 indicates some impairment in reality testing or communication (e.g., speech is at times

(Tr. 191). He prescribed Adderall XR and suggested that a smaller, structured classroom might improve his functioning (Tr. 191).

In late 2008, meetings were held between D.R.'s teachers and social worker to discuss his behavior (Tr. 167-69). Meeting notes indicated that D.R.'s new medication needed time to take effect; the current medications were not working and the teachers and social worker "recommend[ed] a change or increase in dosage" (Tr. 167-69). It was suggested that D.R. spend more time with his social worker (Tr. 167-69). On January 9, 2009, Dr. Rastogi noted no change in D.R.'s behavior, and increased his Adderall dosage (Tr. 192).

A January 12, 2009 Behavior Intervention Plan ("BIP") sought to address D.R.'s refusal to follow directions and classroom rules; defiance towards adults at home and in school; fighting and verbal threats towards peers; anger towards adults; and leaving class without permission and not returning (Tr. 170). The BIP noted that D.R. often instigated conflict with other students; seldom accepted responsibility for his actions; often engaged in negative, attention seeking behaviors; had been suspended several times during the school year; and has a lack of internal self-control and low frustration tolerance which contribute to his overall behavior (Tr. 170). D.R. continued to receive resource room support for reading and math (Tr. 170). The BIP was revised on February 3, 2009 and reflected largely the same notations and accommodations (Tr. 173).

---

illogical, obscure, or irrelevant) or major impairment in several areas such as work or school, family relations, judgment, thinking or mood. A GAF of 41 to 50 means that the patient has serious symptoms . . . OR any serious impairment in social, occupational, or school functioning (*e.g*., no friends, unable to keep a job). A GAF rating of 51 to 60 signals the existence of moderate difficulty in social or occupational functioning.

*White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 276 (6th Cir. 2009). "A GAF score may help an ALJ assess mental RFC, but it is not raw medical data. Rather, it allows a mental health professional to turn medical signs and symptoms into a general assessment, understandable by a lay person, of an individual's mental functioning." *Kornecky v. Comm'r of Soc. Sec*., 167 Fed. App'x. 496, 502 fn. 7 (6th Cir. 2006).

On February 5, 2009, an Individualized Education Program Team Report ("IEP") found D.R. eligible for special education classes (Tr. 157). D.R. was assigned one hour a day in a resource program, and required no support service personnel (Tr. 159). D.R. exhibited: below grade level performance on state/district wide tests; slow progress toward current IEP goals and general education curriculum objectives; and strengths in language arts, verbal skills, and personality (Tr. 157-58). His teachers explained that "[D.R.] is extremely active in class[;] exhibit[s] ADHD behavior[;] has difficulty remaining in his seat, staying out of his classmates' affairs and focusing on his classwork . . . [; and] has a truancy problem" (Tr. 158). D.R. was receiving services from his school's development center, social work services were added, and testing accommodations were designated: small group, extended time, alternate locations, and audio tape (Tr. 158-60).

D.R.'s progress report for the week of March 16, 2009 indicated: a D- and 3-(citizenship) in Reading; an F and 3- in English; a D and 3 in Spelling; a D- and 3 in Mathematics; a D and 3 in Science ("because D.R. does very few assignments"); and an F and 3 in Social Studies (Tr. 154).

On November 10, 2009, Jessica Julius, BA and Wanda Olugbala, LMSW, both of Development Centers, Inc., reported little progress in D.R.'s grades, classwork, and behavior; D.R. had to repeat fourth grade (Tr. 214, 216). They explained contributing issues: D.R.'s frequent failure to attend school; his inattention during class sessions; ADHD medication issues and D.R.'s refusal to take his medication; failure to turn in classwork; and family issues (Tr. 214). However, the evaluation also noted that "[i]n the past month since his medication was changed [, D.R.] has shown more concentration and has been taking his medication daily"; D.R.'s behavior also showed improvement (Tr. 215-16). The report further explained that

"[D.R.] has not made much progress on his goals because of issues with his medication and family changes. Last year his mother's house burned down[;] they had to find a new place to live. . . [, and t]his instability at home has caused [D.R.] to miss a lot of school. [D.R.] needs help being motivated to come to school and to keep taking his medication" (Tr. 216). The report concluded that, although D.R. was focusing in the classroom with the help of medication, he needed additional support to complete his work, build better relationships with his peers and teacher, and to attend school regularly (Tr. 216).

D.R.'s January 29, 2010 IEP maintained his eligibility for special education services, and noted that school personnel had stressed to Plaintiff how important it is for D.R. to regularly take his medication (Tr. 221-22).

On February 24, 2010, Ms. McDonald, D.R.'s general education teacher, completed a teacher questionnaire evaluating D.R.'s functioning (Tr. 231). She noted 32 days of absence (Tr. 231). She found no problem in D.R.'s ability to acquire and use information, noting that D.R. "seems capable of doing the work if and when he wants to. He often refuses to do anything, or very little!" (Tr. 232). In the attending and completing tasks domain, she noted D.R.'s "obvious problem" with: paying attention when spoken to directly; focusing long enough to finish assigned activities; refocusing to task when necessary; carrying out single- and multi-step instructions; and completing classwork assignments (Tr. 233). She noted D.R.'s "serious problem" with: organizing his things or school materials (daily); working without distracting himself or others; and working at a reasonable pace (Tr. 233). Ms. McDonald explained further that "lately [D.R.] has been doing great. In the past, the problems have been as indicated above" (Tr. 233). In the interacting and relating with others domain, Ms. McDonald noted: D.R.'s "obvious" problem with following rules and appropriately seeking attention, expressing anger,

-12-

and asking permission; and, his "serious" problem respecting adults in authority (Tr. 234). In the caring for himself domain, she noted D.R.'s obvious problem with: handling frustration appropriately; being patient when necessary; responding appropriately to changes in his mood; using appropriate coping skills to meet daily demands of school environment; and knowing when to ask for help (Tr. 236).

In concluding her evaluation, Ms. McDonald reported that she "believes that [D.R.] is on some type of medicine that is working well lately. He has been focused and a joy to be around . . . Last school year he appeared to be on and off medication throughout the year. This school year it appears as though he has been on appropriate med[ication]s for the last month" (Tr. 237).

Mr. McNally, a social worker with Development Centers, Inc., wrote a letter on March 1, 2010 explaining that he has provided individual therapy to D.R. since 2007 (Tr. 239-41). D.R. exhibited poor behavior in the classroom, at lunch periods, and in group therapy sessions; and, Mr. McNally reported that "because [D.R.] is so intense in everything he does, the medication can affect him negatively, thus intensifying his out of control reactions" (Tr. 239). D.R. was diagnosed with ADHD, prescribed Adderall 20 mg, and received regularly monthly medical reviews from staff psychiatrist, Dr. Rastogi; his medication had been adjusted several times, and it was hard to determine whether D.R. took the medication daily, because he often spent the night at his grandmother's house (Tr. 239). Mr. McNally further explained that "[Plaintiff] has been advised of this inconsistency[, and] is now ensuring the consistency of daily medication so that [D.R.] can have more successful days in the classroom" (Tr. 240). Classroom interventions were also modified several times; D.R.'s behavior continued to interfere with his learning; he could not sit still without distractions; and D.R. was not able to follow simple instructions (Tr.

240). Mr. McNally concluded that the team approach was the most effective for D.R.; he liked the attention and appeared to do better (Tr. 240).

### D. Plaintiff's Claims of Error

Plaintiff argues that the ALJ erred in: (1) his evaluation of Listing 112.11, and (2) his evaluation of four of the six functional domains: Acquiring and Using Information, Attending and Completing Tasks, Interacting and Relating with Others, and Taking Care of Yourself. For the reasons stated below, this Magistrate Judge finds reversible error in the ALJ's analysis of Listing 112.11, but rejects Plaintiff's second argument.

### 1.   Listing 112.11 – ADHD

Plaintiff argues that the ALJ lacked substantial evidence to find that D.R.'s impairments did not meet or medically equal listing 112.11 for ADHD. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1.

### a.  Adjudicated Time Period: January 1, 2006 – September 26, 2008

As a preliminary matter, Plaintiff disagrees with the ALJ's treatment of ALJ Connolly's previous decision. She argues that the ALJ lacked substantial evidence to "perfunctorily agree with ALJ [Connolly's] decision of 2008" (Dkt. No. 10 at 17)[6], and should have found D.R. disabled under the Listing as early as January 1, 2006, the alleged disability onset date. The Commissioner claims that Plaintiff's argument "has no place before this Court." (Dkt. No. 13 at 10). This Magistrate Judge agrees with the Commissioner.

---

[6] All pages refer to CM/ECF.

*Res judicata* bars the relitigation of the same claim or cause of action [and] collateral estoppel bars the relitigation of the same issue." *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837, 840 (6th Cir. 1997). The Sixth Circuit Court of Appeals established in *Drummond* "that the principles of res judicata can be applied against the Commissioner." *Id.* at 842.

Here, Plaintiff's claim is precisely the same as the claim she made on behalf of D.R. in her initial application, which was denied in September of 2008, and which Plaintiff did not appeal. She alleges the same impairment, and the same disability onset date. As such, the ALJ properly found that his inquiry was limited to the time period *after* ALJ Connolly's September 26, 2008 decision. Furthermore, Plaintiff cannot attack the ALJ's findings here even if, as Plaintiff contends, ALJ Connolly failed to consider Listing 112.11. "Any errors or inconsistencies in ALJ [Connolly]'s decision do not lessen its binding effect[; t]he bar of *res judicata* does not only apply to good decisions." *Jackson v. Apfel*, 74 F. Supp. 2d 698, 700 (E.D. Mich. 1999).

### b. Unadjudicated Time Period: September 27, 2008 – February 25, 2011

This Magistrate Judge next examines Plaintiff's argument as it applies to the unadjudicated time period. In order to meet Listing 112.11, D.R. must satisfy the A criteria, which requires medically documented findings of all three of the following: (1) marked inattention; (2) marked impulsiveness; and (3) marked hyperactivity. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.11. Medically documented findings of the enumerated criteria must also result in a "marked" impairment or difficulty in at least two of the four B criteria. *Id.* Plaintiff

-15-

disputes only two of the B criteria: (1) age-appropriate social functioning, and (2) maintaining concentration, persistence, or pace. *Id; see* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.02(B).

Plaintiff argues that D.R. met or medically equaled the listing through the necessary medically documented findings and D.R.'s "marked" (1) impairment in age-appropriate social functioning and (2) difficulties in maintaining concentration, persistence, or pace (Dkt. No. 10 at 11). But, the ALJ gave *no* explanation for his finding that D.R. did not meet the Listing. He merely concluded that "[t]he claimant does not have an impairment or combination of impairments that meets or medically equals listings 112.11" (Tr. 18). This Magistrate Judge finds this to be reversible error.

The lack of a meaningful explanation is antithetical to judicial review.[7] *See, e.g.*, 42 U.S.C. § 405(b)(1); *Christephore v. Comm'r of Soc. Sec.*, 11-13547, 2012 WL 2274328, at *6 (E.D. Mich. June 18, 2012) (citing *Reynolds v. Comm'r,* 424 F. App'x 411, 416 (6th Cir.2011) ("an ALJ must analyze the claimant's impairments in relation to the Listed Impairments and must give a reasoned explanation of his findings and conclusions in order to facilitate meaningful review"); *Brown v. Bowen*, 794 F.2d 703, 708 (D.C.Cir. 1986) ("The judiciary can scarcely perform its assigned review function, limited though it is, without some indication not only of what evidence was credited, but also whether other evidence was rejected rather than simply ignored.").

The Commissioner argues that whatever the error – if any – it is harmless, because Plaintiff fails to allege any *medically* documented findings of marked inattention, marked impulsiveness, or marked hyperactivity as required by part A, thus precluding additional analysis

---

[7] The fact that ALJ Connolly's prior decision did not appear to provide *any* reasoning for finding that D.R. did not meet or medically equal a listing clouds Plaintiff's ability to understand the basis of the ALJ's decision here (Tr. 72).

in part B. This Magistrate Judge disagrees. Much of what Plaintiff cites in support of her argument (D.R.'s testimony, a daily activities questionnaire Plaintiff completed, and social worker reports (Dkt. No. 10 at 16)) does not constitute medically documented evidence. *See* SSR 06-03p; 20 C.F.R. § 416.913(a). However, the record is not devoid of *any* medically documented findings relevant to Listing 112.11 for the unadjudicated time period: Dr. Rastogi's November 2008 psychiatric evaluation indicated symptoms of inattentiveness and impulsiveness; diagnosed D.R. with ADHD, hyperactive or combined; and noted that D.R. had been treating with Dr. Hosseini, another psychiatrist associated with Development Centers, Inc., for ADHD since 2006 (184-91). This evidence may be enough to support a finding that D.R.'s impairments meet or medically equal Part A.

Other evidence may be enough to support a finding that D.R.'s impairments meet part B. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.02(B).  With respect to age-appropriate social functioning, Plaintiff asserts error based on the following relevant evidence: D.R.'s January 2009 BIP, noting his disruptive behavior with peers and adults (Tr. 170-71); a 2008 psychiatric examination indicating D.R.'s general difficulty in getting along with others (Tr. 186-87); and a November 2009 Development Centers, Inc. review indicating D.R.'s trouble getting along with others (Tr. 216). With respect to concentration, persistence, or pace, Plaintiff asserts error based on the following relevant evidence: a 2008 psychiatric exam indicating inattentiveness (Tr. 184); the November 2009 review indicating D.R.'s lack of progress towards improving his inattention (Tr. 214-216); and, Ms. McDonald's February 2010 evaluation demonstrating D.R.'s serious problem working at a reasonable pace (Tr. 233).

A discussion of Listing 112.11 – as it applies to the unadjudicated period of time at issue – may not change the ALJ's ultimate decision, because the ALJ seemed to find at least some of

D.R.'s impairments to be positively affected by regular medication. However, Plaintiff and D.R. are entitled to a rationale for the ALJ's finding that D.R.'s impairments do not meet or medically equal Listing 112.11; on remand, the ALJ ought to provide a thorough analysis accordingly.

### 2.        The ALJ's Assessment of Functional Domains

Plaintiff next asserts error in the ALJ's evaluation of four of the six broad functional domains, claiming that the ALJ should have found marked limitations in two, or extreme limitations in one of the disputed categories: Acquiring and Using Information, Attending and Completing Tasks, Interacting and Relating with Others, and Caring for Yourself.

As discussed above, to establish a disability under the standards for SSI child's benefits, Plaintiff must show that D.R.'s impairment resulted in: (A) "marked" limitations in two functional domains, or (B) an "extreme" limitation in one domain. 20 CFR § 416.926a(a). The regulations provide:

> We will find that you have a "marked" limitation in a domain when your impairment[ ] interferes seriously with your ability to independently initiate, sustain, or complete activities. Your day-to-day functioning may be seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities. "Marked" limitation also means a limitation that is "more than moderate" but "less than extreme." It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean.
>                                        * * *
> We will find that you have an "extreme" limitation in a domain when your impairment(s) interferes very seriously with your ability to independently initiate, sustain, or complete activities. Your day-to-day functioning may be very seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities. "Extreme" limitation also means a limitation that is "more than marked." "Extreme" limitation is the rating we give to the worst limitations. However, "extreme limitation" does not necessarily mean a total lack or loss of ability to function. It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean.

20 CFR §§ 416.926a(e)(2)(i) and 416.926a(e)(3)(i).

As discussed above, *Drummond* clarified the application of *res judicata* to the Commissioner. *See* 126 F.3d at 842 ("[w]hen the Commissioner has made a final decision concerning a claimant's entitlement to benefits, the Commissioner is bound by this determination absent changed circumstances."). After the decision in *Drummond*, the Commissioner issued an Acquiescence Ruling applicable to the Sixth Circuit requiring an ALJ to adhere previous findings by an ALJ, unless the claimant presents new or material evidence of deterioration in her condition. It states that:

> [w]hen adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding.

SSAR 98–4(6), 63 Fed.Reg. 29771–01 (June 1, 1998).

Thus, departing from ALJ Connolly's functional domain findings requires that Plaintiff show "new and material evidence" that D.R.'s condition worsened. AR 98-4(6); *See, e.g., Drogowski v. Comm'r of Soc. Sec.*, Case No. 10-12080, 2011 WL 4502955, at *2-3 (E.D. Mich. Sept. 28, 2011); *Slick v. Comm'r of the Soc. Sec. Admin.*, Case No. 07-13521, 2009 WL 136890, at *2 (E.D. Mich. Jan. 16, 2009). Plaintiff simply contests the ALJ's findings by stating that "if anything, there were bigger problems with D.R. as he grew older" (Dkt. No. 10 at 17). This does not satisfy Plaintiff's burden, and this Magistrate Judge finds that substantial evidence supports the ALJ's finding that there was no worsening of D.R.'s condition in each of the disputed domains.

### a.   *Acquiring and Using Information*

Plaintiff argues that the ALJ erred in finding that D.R. suffered from less than marked limitations in his ability to acquire and use information, because the ALJ did not comply with SSR 09-3p's requirement that an ALJ consider "poor grades" and "other accommodations made for [D.R.'s] impairments." SSR 09-3p; (Dkt. No. 10 at 13).

The regulations state the following:

In the domain of "Acquiring and Using Information," we consider a child's ability to learn information and to think about and use the information.
* * *
Because much of a . . . school age child's learning takes place in a school setting, . . . school records are often a significant source of information about limitations in [this] domain. Poor grades or inconsistent academic performance are among the more obvious indicators of a limitation in this domain provided they result from a medically determinable mental or physical impairment[]. Other indications in school records that a mental or physical impairment[] may be interfering with a child's ability to acquire and use information include, but are not limited to:
* * *
*Other accommodations* made for the child's impairment[], both inside and outside the classroom, such as front-row seating in the classroom, more time to take tests, having tests read to the student, or after-school tutoring.

The kind, level, and frequency of special education, related services, or other accommodations a child receives can provide helpful information about the severity of the child's impairment[ ]. . . Although we consider formal school evidence (such as grades and aptitude and achievement test scores) in determining the severity of a child's limitations in this domain, we do not rely solely on such measures. We also consider evidence about the child's ability to learn and think from medical and other non-medical sources (including the child, if the child is old enough to provide such information), and we assess limitations in this ability in all settings, not just in school.
* * *
To . . . assist adjudicators in evaluating a child's impairment-related limitations in [this] domain . . . we . . . provide the following examples of some of the limitations we consider in this domain. . . [:] . . . [i]s not reading, writing, or doing arithmetic at appropriate grade level[; h]as difficulty comprehending written or oral directions[; s]truggles with following simple instructions.

-20-

SSR 09-3p (internal quotations omitted).

Plaintiff points to the ALJ's failure to expressly mention D.R.'s March 2009 grades; emphasizes that D.R. had to repeat first and fourth grade; and notes that D.R. was to receive accommodations for standardized tests (Dkt. No. 10 at 20).

The ALJ did not expressly mention the March 2009 grades, but those grades reflect one week's progress report (Tr. 154); it was reasonable for the ALJ to have found them unworthy of elaboration with respect to D.R.'s ability to acquire and apply new information. These are the only grades included in the record. Plaintiff relies primarily on this Magistrate Judge's decision in *Jones o/b/o K.D.W v. Comm'r of Soc. Sec.,* Case No. 12-10482, 2013 WL 588928 (E.D. Mich. Jan. 11, 2013) *report and recommendation adopted*, 12-10482, 2013 WL 557266 (E.D. Mich. Feb. 13, 2013). While the undersigned acknowledges parallels between the respective facts, this matter is distinct in the comprehensiveness of the ALJ's analysis and the relatively minimal grade evidence on the record. Furthermore, Plaintiff does not substantiate her argument that *Jones* alone warrants a finding of reversible error.

The ALJ did discuss D.R.'s need to repeat the first and fourth grade and Mr. McNally's finding that the team approach best-suited D.R.'s needs (Tr. 20-21). The ALJ discussed D.R.'s January 29, 2010 IEP, which included information on the relevant accommodations pointed out by Plaintiff, as well as the five out of twenty-five hours that D.R. had to spend in the resource room program each week (Tr. 214-16); *see* SSR 09-3p ([t]he kind, level, and frequency of special education, related services, or other accommodations a child receives can provide helpful information about the severity of the child's impairment[ ]).

The ALJ also discussed Ms. McDonald's February 24, 2010 Teacher Questionnaire, which found no problem in D.R.'s ability to acquire and use information, and which demonstrated the positive changes that corresponded with D.R.'s medication compliance (Tr. 20-21; 231-38) The ALJ noted Ms. McDonald's observation that D.R.'s attitude – not his ability to comprehend  – was the root of his problem (Tr. 20-21; 232).

In short, the ALJ provided a comprehensive analysis, reasonably finding no worsening of D.R.'s condition since ALJ Connolly's decision, and less than marked limitations in this domain. This Magistrate Judge finds that these findings are supported by substantial evidence and do not contravene SSR 09-3p.

### b.  Attending and Completing Tasks

Plaintiff argues that the ALJ erred in finding that D.R. suffered from less than marked limitations in his ability to attend and complete tasks.

The regulations state the following:

In the domain of "Attending and Completing Tasks," we consider a child's ability to focus and maintain attention, and to begin, carry through, and finish activities or tasks. We consider the child's ability to initiate and maintain attention, including the child's alertness and ability to focus on an activity or task despite distractions, and to perform tasks at an appropriate pace. We also consider the child's ability to change focus after completing a task and to avoid impulsive thinking and acting. Finally, we evaluate a child's ability to organize, plan ahead, prioritize competing tasks, and manage time

* * *

As in any domain, when we evaluate a child's limitations in [this] domain, we consider how appropriately, effectively, and independently the child functions compared to children of the same age who do not have impairments. For example, a teacher may report that a child "pays attention well with frequent prompting." The need for frequent prompting demonstrates that the child is not paying attention as appropriately, effectively, or independently as children of the same age who do not have impairments. Despite the fact that the child is paying attention with prompting, this child is not functioning well in this domain.

* * *

-22-

The domain of "Attending and completing tasks" covers only the mental aspects of task completion; such as the mental pace that a child can maintain to complete a task. Therefore, limitations in the domain of "Attending and completing tasks" are most often seen in children with mental disorders. For example, in school:

> Children with attention-deficit/hyperactivity disorder (AD/HD) whose primary difficulty is inattention may be easily distracted or have difficulty focusing on what is important and staying on task. They may fail to pay close attention to details and make careless mistakes in schoolwork, avoid projects that require sustained attention, or lose things needed for school or other activities beyond what is expected of children their age who do not have impairments.

> Children with AD/HD whose primary difficulty is hyperactivity and impulsivity may fidget with objects instead of paying attention, talk instead of listening to instructions, or get up from their desks and wander around the classroom beyond what is expected of children their age who do not have impairments.
>                                    * * *

To . . . assist adjudicators in evaluating a child's impairment-related limitations in [this] domain, we . . . provide the following examples of some of the limitations we consider in this domain . . . [:] . . . [r]epeatedly becomes sidetracked from activities or frequently interrupts others.[; n]eeds extra supervision to stay on task.

SSR 09-4p.

Plaintiff grounds her assertion in the "serious" and "obvious" problems that Ms. McDonald's evaluation noted in this domain, and the negative remarks in Mr. McNally's March report.[8]

Although the ALJ did not explicitly discuss Mr. McNally's report, the ALJ did comprehensively discuss various relevant school records and hearing testimony (Tr. 21-23). The ALJ also discussed Ms. McDonald's note in this domain: D.R. has been doing great lately, and that the questionnaire reflected problems in the past (Tr. 233).

---

[8] Mr. McNally's report also reflected a positive change in D.R.'s behavior when regularly taking medication, which was difficult to ensure because D.R. spent much time at this grandmother's house (Tr. 233, 239-40).

While this Magistrate Judge does not dispute that D.R. has experienced limitations, "[t]he Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. The substantial evidence standard presupposes that there is a "zone of choice" within which the Commissioner may proceed without interference from the courts. If the Commissioner's decision is supported by substantial evidence, a reviewing court must affirm." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir.1994). Accordingly, this Magistrate Judge finds that the ALJ's decision was based on substantial evidence, and finds no reason to disturb the Commissioner's findings.

### c.  *Interacting and Relating with Others*

Plaintiff argues that the ALJ erred in finding that D.R. suffered from less than marked limitations in his ability to interact and relate with others.

The regulations state the following:

In the domain of "Interacting and relating with others," we consider a child's ability to initiate and respond to exchanges with other people, and to form and sustain relationships with family members, friends, and others. This domain includes all aspects of social interaction with individuals and groups at home, at school, and in the community. Important aspects of both interacting and relating are the child's response to persons in authority, compliance with rules, and regard for the possessions of others.

\* \* \*

Children with impairment-related limitations in this domain may not be disruptive; therefore, their limitations may go unnoticed. Such children may be described as socially withdrawn or isolated, without friends, or preferring to be left alone. These children may simply not understand how to accomplish social acceptance and integration with other individuals or groups. However, because children achieve much of their understanding about themselves and the world from their interactions, the impairment-related limitations of children who withdraw from social interaction may be as significant as those of children whose impairments cause them to be disruptive.

\* \* \*

To. . . assist adjudicators in evaluating a child's impairment-related limitations in the domain of "Interacting and relating with others," we. . . provide the following examples

-24-

of some of the limitations we consider in this domain . . . [.] . . . [h]as no close friends, or has friends who are older or younger[; a]voids or withdraws from people he or she knows[; h]as difficulty cooperating with others.

SSR 09-5p.

In order to support her argument, Plaintiff solely points to the "serious" and "obvious" problems, as they relate to this domain, indicated by Ms. McDonald in her February 24, 2010 questionnaire. In making his findings, the ALJ discussed these aspects of Ms. McDonald's questionnaire, in addition to a variety of school records and hearing testimony supportive of the ALJ's conclusion (Tr. 23-25). The ALJ reasonably found that Plaintiff had demonstrated no worsening of D.R.'s condition since ALJ Connolly's decision. This Magistrate Judge finds no reason to disturb the ALJ's determination.

### d.   Caring for Yourself

Plaintiff argues that the ALJ erred in finding that D.R. suffered from no limitation in his ability to care for himself.

The regulations state the following::

In the domain of "Caring for Yourself," we consider a child's ability to maintain a healthy emotional and physical state. This includes: [h]ow well children get their emotional and physical wants and needs met in appropriate ways[; h]ow children cope with stress and changes in the environment, and[; h]ow well children take care of their own health, possessions, and living area.

* * *

 [I]n "Caring for yourself," we focus on how well a child relates to self by maintaining a healthy emotional and physical state in ways that are age-appropriate and in comparison to other same-age children who do not have impairments.

A child may have limitations in [this] domain . . . because of a mental or a physical impairment(s), medication, or other treatment. For example, if an adolescent who is prescribed a medication that causes weight gain frequently fails or refuses to take it

because of embarrassment about his weight, thereby endangering his health, we would
evaluate this limitation in the domain of "Caring for Yourself."

* * *

Children must learn to recognize and respond appropriately to their feelings in ways that
meet their emotional wants and needs; for example, seeking comfort when sad,
expressing enthusiasm and joy when glad, and showing anger safely when upset. To be
successful as they mature, children must also be able to cope with negative feelings and
express positive feelings appropriately. In addition, after experiencing any emotion,
children must be able to return to a state of emotional equilibrium. The ability to
experience, use, and express emotion is often referred to as self-regulation. Children
should demonstrate an increased capacity to self-regulate as they develop.

Ordinary circumstances may cause emotions, such as fear, sadness, or frustration.
Examples of age-appropriate, self-consoling activities to regulate such emotions include:
. . . [f]or a school-age child, playing a computer game when bored . . .[.]

However, children whose mental or physical impairments affect the ability to regulate
their emotional well-being may respond in inappropriate ways. For example: . . . [a] child
with attention-deficit/hyperactivity disorder who has difficulty completing assignments
may express frustration by destroying school materials . . .[.]

In addition to regulating emotional well-being, a child must be able to satisfy physical
wants and needs every day . . . The domain of "Caring for Yourself" involves the
emotional ability to engage in self-care activities, such as feeding, dressing, toileting, and
maintaining hygiene and physical health.

* * *

To further assist adjudicators in evaluating impairment-related limitations in [this]
domain . . . we also provide the following examples of some of the limitations we
consider in this domain. . . [: h]as restrictive or stereotyped mannerisms (for example,
head banging, body rocking)[; d]oes not spontaneously pursue enjoyable activities or
interests (for example, listening to music, reading a book)[; e]ngages in self-injurious
behavior (for example, refusal to take medication, self-mutilation, suicidal gestures) or
ignores safety rules[ d]oes not feed, dress, bathe, or toilet self appropriately for age[; h]as
disturbance in eating or sleeping patterns.

SSR 09-7p.

The ALJ found that D.R. had no limitation in caring for himself. This finding is harmless

error. This Magistrate Judge believes that the ALJ made a typographical error, and intended to

-26-

indicate that D.R. had *less than marked* limitations in this domain. First, ALJ Connolly found

that D.R. had less than marked limitation in this domain, and the ALJ's analysis of functional

domains is otherwise consistent in its reference to ALJ Connolly's previous functional domain

findings (Tr. 77-78). Second, the ALJ's analysis acknowledges certain limitations in this domain.

 Plaintiff argues that the ALJ should have found at least a marked impairment in this

domain. She cites to the "obvious" problems in five of the ten enumerated categories, as

reflected in the relevant portion of Ms. MacDonald's February 24, 2010 questionnaire: handling

frustration appropriately, being patient when necessary, calming himself, using appropriate

coping skills at school, and knowing when to ask for help (Tr. 27, 236). However, these were

noted as weekly problems, and Ms. McDonald indicated slight or no problem at all in the

remaining categories relevant to this domain (Tr. 236). The ALJ expressly mentioned this

portion of Ms. McDonald's questionnaire alongside other evidence showing that: Plaintiff was

capable of taking care of his daily living activities; was able to calm himself when he had

nightmares; and could think of nothing that made him sad (Tr. 27-28, 187)

 Plaintiff also argues that the ALJ should have considered D.R.'s medication side effects

and unstable housing situation in evaluating limitations in this domain. Plaintiff asserts that these

constitute good reasons that justified D.R.'s failure to taken his medication "religiously,"

pursuant to SSR 09-7p (Dkt. No. 10 at 22).[9] The ALJ expressly noted the housing instability that

---

[9] Plaintiff relies on a truncated version of the following excerpt, but fails to substantiate
further: "We do not consider a child fully responsible for failing to follow prescribed treatment.
Also, the policy of failure to follow prescribed treatment does not apply unless we first find that
the child is disabled. Under this policy, we must also find that treatment was prescribed by the
child's treating source. . . and that it is clearly expected that, with the treatment, the child would
no longer be disabled. Even then, we must consider whether there is a good reason for the failure
to follow the prescribed treatment. For example, if the child's caregiver believes the side effects
of treatment are unacceptable, or an adolescent refuses to take medication because of a mental

affected D.R. during the period at issue, and its resulting effect on D.R.'s general progress, medication consistency, and school attendance (Tr. 27). It was reasonable for the ALJ to find that, while related to this domain, these challenges constituted no more than a less than marked limitation.

The ALJ reasonably concluded that D.R.'s condition has not worsened, and substantial evidence supports what this Magistrate Judge assumes to be the ALJ's intended finding of less than marked limitation. Plaintiff has shown no reason to disturb the ALJ's findings.

## IV.    CONCLUSION

Because the ALJ made no findings with respect to Listing 112.11 for the unadjudicated time period, this Magistrate Judge **RECOMMENDS** that Plaintiff's motion for summary judgment be **GRANTED**, Defendant's motion for summary judgment be **DENIED**, and the case be **REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g).

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to

---

disorder, we would find that there is a good reason for not following the prescribed treatment. However, if there is not a good reason and all the other requirements are met, a denial based on failure to follow prescribed treatment would be appropriate." *See* 20 CFR 416.930; SSR 82-59.

this Report and Recommendation.  *See Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be no more than 20 pages in length unless, by motion and order, the page limit is extended by the court. The response shall address each issue contained within the objections specifically and in the same order raised.

s/Mark A. Randon
Mark A. Randon
United States Magistrate Judge


Dated:  June 28, 2013


### Certificate of Service

*I hereby certify that a copy of the foregoing document was mailed to the parties of record on this date, June 28, 2013, by electronic and/or ordinary mail.*

*s/Eddrey Butts*
*Case Manager for Magistrate Judge Mark A. Randon*